**AFFIDAVIT OF SPECIAL AGENT LAURA SMITH IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, LAURA SMITH state:

### INTRODUCTION AND AGENT BACKGROUND

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Boston, Massachusetts Field Office.  Since joining the FBI in 2010 I have been assigned to complex financial investigations, and I am currently on a squad that investigates economic crimes, including various forms of corporate fraud and securities fraud.  As a federal agent, I am authorized to investigate violations of United States law and to execute warrants issued under the authority of the United States.  I hold a Bachelor's degree in Criminal Justice-Economic Crimes Investigation and a Master's degree in Accounting.

2.    I am currently investigating Peter Brand ("BRAND"), Alexandre Ryjik ("RYJIK"), and Jie "Jack" Zhao ("ZHAO") for various crimes, including, but not limited to, wire fraud, honest services wire fraud, and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1343, 1346 and 1349, respectively; money laundering and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1956(a) and 1956(h), respectively; and federal programs bribery, in violation of Title 18, United States Code, Section 666 (collectively, the "Target Offenses").

3.    I submit this affidavit in support of an application for a warrant under 18 U.S.C. § 2703(a) and Rule 41 of the Federal Rules of Criminal Procedure to search and seize records and data from the e-mail accounts identified as ▮▮▮▮▮▮▮▮▮▮ ("Target Account 1") and ▮▮▮▮▮▮▮▮▮▮▮▮ ("Target Account 2") (collectively, "the Target Accounts") (as described in Attachments A-1 and A-2).

4.     I have probable cause to believe that the Target Accounts contain evidence, fruits, and instrumentalities of the crimes identified above, as described in Attachment B-1 and B-2. I have probable cause to believe that BRAND, a former Harvard College fencing coach, conspired with RYJIK and ZHAO to recruit ZHAO's two sons to the Harvard College fencing team in exchange for bribes, in order to facilitate their admission to Harvard.

5.     Based on the e-mail addresses' domain names, I have probable cause to believe that the accounts and relevant data are maintained by Google LLC ("Google") which, government databases indicate, accepts service of process at: 1600 Amphitheatre Parkway, Mountain View, California 94043, and via the website https://support.google.com/legal-investigations/contact /LERS, as described in Attachments A-1 and A-2.

6.     The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE TO BELIEVE THAT FEDERAL CRIMES WERE COMMITTED

### A. Relevant Individual and Entities

7.     BRAND and his spouse, Jacqueline Phillips ("Phillips"), are residents of Cambridge, Massachusetts, and previously resided in Needham, Massachusetts. From in or about 1999 until in or about July 2019, Brand was employed as the head coach of men's and women's fencing at Harvard College. As set forth below, Brand was terminated in or about July 2019 for violating Harvard's conflict-of-interest policy. Phillips has been employed as Manager of Training & Staff Development for the City of Cambridge, Massachusetts since in or about 2007.

8.     RYJIK is a resident of Alexandria, Virginia.  He is the founder and president of the National Fencing Foundation of Washington D.C., Inc. (the "NFF"), a non-profit organization founded in or about 2007.  According to its website, the NFF is dedicated to "developing personal character, academic achievement, and athletic excellence through the world of fencing."  The NFF's website indicates that it provides classes, equipment and fencing instruction to underprivileged youth.  RYJIK is also the president and founder of the Virginia Academy of Fencing (the "Virginia Academy").  According to its website, the Virginia Academy was founded in 1991 and is the world's largest fencing school.

9.     ZHAO is a resident of Maryland.  He is the chief executive officer of iTalk Global Communications, Inc., ("iTalk"), a telecommunications company that he co-founded in 2003. ZHAO briefly served as a vice president of the NFF in or around 2011.

10.     ▮▮▮▮▮▮ is ZHAO's oldest son. ▮▮ attended Harvard College between approximately 2014 and 2018.  As an undergraduate, he served as captain of the Harvard College men's fencing team.  Zhao previously took classes at the Virginia Academy.

11.     ▮▮▮▮▮▮▮▮ is ZHAO's younger son. ▮▮▮ matriculated at Harvard College in or around the fall of 2017, and is currently a member of the men's fencing team.  He previously took classes at the Virginia Academy.

**B.  The Bribery and Money Laundering Scheme**

12.     As set forth below, beginning at least in or around 2012, ZHAO, BRAND and RYJIK discussed a scheme pursuant to which BRAND would facilitate the admission of ZHAO's two sons to Harvard by recruiting them to join the men's fencing team, in exchange for "financial support" from ZHAO.  The scheme ultimately involved ZHAO contributing $1 million to RYJIK's fencing foundation, the NFF, which, in turn, contributed $100,000 to a

foundation set up and controlled by BRAND and Phillips.[1]  ZHAO also paid for BRAND's car,

made college tuition payments for BRAND's son, paid the mortgage on BRAND's Needham

residence, and later purchased the residence for well above its market value, thus allowing

BRAND to purchase a more expensive residence in Cambridge, which ZHAO then paid (in part)

to renovate.  In total, ZHAO appears to have made payments to BRAND, or for his personal

benefit, totaling more than $1.4 million.  BRAND did not disclose these payments to Harvard,

even as he recruited ZHAO's sons to the Harvard fencing team, thereby helping to ensure their

admission to Harvard.

### BRAND's Financial Difficulties

13.     As part of my investigation, I have reviewed emails that BRAND and Phillips

exchanged using their workplace e-mail accounts (in BRAND's case, his Harvard account, and in

Phillips' case, her City of Cambridge account).  These emails indicate that, between at least 2009

and 2012, BRAND and Phillips were experiencing financial difficulties.

14.     For example, on or about February 10, 2009, Phillips wrote to BRAND: "Hi Peter,

I still do not think you understand that our bank of America account does not have overdraft

protection and we can barely pay the bills…yesterday you withdrew a total of $122.57.  We did

not have the money…lots of bills are pending to be paid on Friday.  I spent my inheritance money

for tuition for Alex.  Where are we getting money for summer school, for next year's tuition, for

the electric bill? I am sorry but you cannot use your ATM card whatsoever----if it happens again

we will need to cut your card.  I cut up my ATM card many months ago."

---

[1] BRAND's foundation ultimately contributed most of the $100,000 donation to three
charitable organizations.  As noted below, Phillips also paid herself a salary of $22,000 for serving
as a director.

15.     On or about February 9, 2011, Phillips emailed BRAND the following:

**From:** Phillips, Jacqueline█████████████████████
**Sent:** Wednesday, February 09, 2011 11:15 AM
**To:** Brand, Peter
**Subject:** STOP. STOP.STOP

Peter,

You used the debit card again yesterday at Sudbury Farms.

STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.
STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.
STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.
STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.
STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.
STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.
STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.

We are down to $100 in the account until Friday and there may be pending purchases.

16.     On or about July 12, 2011, BRAND forwarded Phillips information he had obtained from Harvard about salary advances, noting: "Here is what i can do. Also, by joining the CU [credit union] I can borrow up to $25,000 in form of a 5 year personal loan at 10.7%. Let me know what you think."

17.     In an email on or about January 4, 2012, Phillips told BRAND, "We have almost no money in Bank of America and there are bill pending. Do NOT use atm for ANYTHING."

18.     In an email exchange on or about April 19, 2012, Phillips forwarded BRAND a job posting with the subject line "part time[.]" BRAND responded: "Can't hold a state job due to pension but I'll apply for a per diem position at Charles River ARC[...] How much do I need to with hold on taxes again?" Phillips replied: "Not sure but at least $200 per week for federal taxes[.]" BRAND responded: "That's almost half of my monthly paycheck[.]" Phillips replied: "Ok $150 per week call our tax guy and ask him. We have owed $6000 extra in taxes each year for the last 10 years. We just maxed out our equity line of credit[.]"

5

BRAND's Texts with RYJIK Concerning the Admission of ZHAO's Children

19.     On or about May 1, 2012—less than two weeks after Phillips advised BRAND that they had "maxed out" their equity line of credit—BRAND sent the following text message to RYJIK: "Jack doesn't need to take me anywhere and his boys don't have to be great fencers. All I need is a good incentive to recruit them[.] You can tell him that[.]" Based on my training and experience and my knowledge of the investigation, I understand BRAND's reference to "Jack" to refer to ZHAO, whose nickname is "Jack". At the time of the text exchange, ZHAO's older son, ███ was approaching the end of his junior year in high school.

20.     In a series of text messages over the ensuing month, BRAND and RYJIK discussed an arrangement by which ZHAO's sons would be recruited to the Harvard fencing team in exchange for money. In one message, RYJIK wrote: "Is there space for[…] your favorite Chinese supporter?" BRAND replied: "Of course as long as Z[h]ao cones [sic] through with the financial support ;)" BRAND later wrote: "He is my no 1 recruit as long as my future us [sic] secured."

21.     On or about July 16, 2012, BRAND texted RYJIK to inquire whether he had "spoken to Zhao yet". RYJIK responded: "Off [sic] course call me when u can[.]"

22.     On or about September 18, 2012, RYJIK emailed BRAND at Target Account 1, forwarding a "Nonprofit Checklist." On or about the same date, BRAND acknowledged that he had received the email.

ZHAO's Purported Donation to the NFF Prior to ███ Zhao's Admission to Harvard

23.     Bank records indicate that, on or about February 19, 2013, ZHAO purported to donate approximately $1 million to the NFF. This was, by far, the largest donation the NFF had ever received.[2]

24.     On or about March 5, 2013, RYJIK emailed BRAND at Target Account 1, along with two attorneys for the NFF, Phillip Sbarbaro ("Sbarbaro")[3] and Dennis Molloy ("Molloy"). RYJIK wrote: "Gentlemen, Please start a communication about establishing the Foundation."

25.     On or about April 2, 2013, RYJIK again emailed Sbarbaro, Molloy, and BRAND at Target Account 1, asking about the status of establishing "the foundation with Peter Brand in charge."

26.     On or about April 5, 2013, BRAND replied to RYJIK's March 5, 2013 email via Target Account 1, stating, "Dear all, Please let me know what you need from me in order to move forward on this project."

27.     BRAND and Phillips ultimately established the Peter Brand Foundation in or about May 2013, although the foundation did not receive tax-exempt status until July 2014.[4]

28.     On or about May 23, 2013, just three months after contributing $1 million to the NFF, ZHAO resigned as the foundation's vice president, citing his "busy schedule".

29.     On or about October 20, 2013, RYJIK texted BRAND as follows: "If u get tickets for the World Series I can pay for it." BRAND responded: "Baseball us [sic] boring :), but I can

---

[2] Between 2009 and 2012, the NFF received contributions totaling approximately $25,000. The NFF received no donations in the two years following ZHAO's purported donation.

[3] Sbarbaro was also the NFF's secretary.

[4] Most of the remainder of ZHAO's contribution remains in the NFF's brokerage account. As of May 2020, the account had a value of approximately $912,000.

7

use the donation to the foundation after tomorrow. Did you get the information?" RYJIK responded, "Yes sir. Have a meeting on Tuesday. Has to be done the rite [sic] way."

30.     The following day, BRAND received an email informing him that the Harvard admissions committee had voted ███ Zhao's admission as "likely."[5] BRAND forwarded the email to Phillips 21 minutes later, writing: "Good news indeed :)[.]"

31.     BRAND then texted RYJIK as follows: "Your man is good to go. Don't say anything to him until he receives the call from admissions."

32.     On or about October 24, 2013, BRAND sent a text to RYJIK stating, in part, "I sent you the revised document under a new gmail account ████████████. Check your spam box if you don't see it." The same day, BRAND emailed RYJIK via Target Account 2, stating he was trying to get his foundation up and running, and noting that he understood from Sbarbaro that "donations may not be forthcoming until tax exempt status is in place which can take at least 6 months." RYJIK responded: "Thanks brother. It all good."

33.     On or about October 25, 2013, BRAND again emailed RYJIK via Target Account 2, noting: "I just want to confirm that the contributions total 7.5 Million as we discussed this initially to make sure that all of this is worth my while."

34.     On or about December 13, 2013, ███ was officially admitted to Harvard as a member of the class of 2018.

35.     On or about that same day, ZHAO emailed BRAND, attaching his son's Harvard acceptance letter. ZHAO wrote: "Hi Boss, It is official now. I just want to thank you for what you did, really appreciate."

---

[5] Some colleges and universities, including Harvard, inform students prior to their formal admission that their admission is "likely". Such "likely letters" are frequently used in the case of recruited student-athletes.

36.     On or about July 18, 2014, Phillips emailed Sbarbaro, copying BRAND at Target Account 2, stating that the NFF Board's proposed distribution of funds was not "in line with the vision, goals and viability of the foundation during the lifetime of Peter Brand." Phillips noted that she hoped they (BRAND, Phillips, and the NFF) could resolve their differences, "because both you and your board member, Alex Ryjik, have not only been instrumental and encouraging but were, in fact, the sole inspiration for the genesis of the Peter Brand Foundation."

37.     On or about August 3, 2014, RYJIK emailed BRAND at Target Account 1, congratulating him on the fact that the Peter Brand Foundation had received tax exempt status.

38.     On or about October 30, 2014, shortly after ███ Zhao matriculated at Harvard, the NFF contributed $100,000 to the Brand Foundation. The contribution was funded by ZHAO's $1 million dollar contribution to the NFF.[6]  Using that money, the Brand Foundation paid Phillips $22,000 for serving as a director, and reimbursed her more than $4,000 for various expenses. The foundation also spent more than $11,000 on legal fees and donated more than $71,000 to three other charities:  the Cambridge Center for Adult Education, in Cambridge, Massachusetts; the Lake Shore Center for the Arts, in Westfield, New York, and Maccabi USA, a Philadelphia, Pennsylvania-based charity that funds athletic, cultural and educational programs for Jewish youth. The contribution from the NFF was the only money the Brand Foundation received prior to its dissolution in 2016, other than approximately $29,000 that BRAND and Phillips contributed that same year, which effectively reimbursed the foundation for the money it had previously paid Phillips.

_____

[6] According to subsequent January 9, 2020 NFF Board meeting minutes, "The two transactions were not linked in any way. Mr. Zhao gave the NFF the $1,000,000 for the successful completion of his sons' high school fencing careers. Mr. Zhao had no knowledge of or input into NFF's decision to help the Peter Brand Foundation organize and establish itself as a tax-exempt entity."

ZHAO's Financial Support of Brand

39.     On or about June 29, 2015 and July 22, 2015, ZHAO sent two checks to Penn State University, in the amounts of $6,489.16 and $1,939.50, respectively, to pay for BRAND's son's tuition. The checks were written from ZHAO and his wife's joint Citibank checking account ending -9902 (the "Citibank account"). Both checks had the identifier ███████ written in the memo line, which corresponds to BRAND's son's student ID number.

40.     Between in or around July 2015 and October 2015, three payments totaling $119,051.52 were made from ZHAO's Citibank account to CCO Mortgage Corp. The payments referenced loan number ███████ –the mortgage loan on BRAND's Needham residence.

41.     On or about July 30, 2015, ZHAO wrote a check in the amount of $2,573.45 to the Town of Needham, Massachusetts. The memo line indicated that the money was "For P Brand 212 Forest Street", referencing the address of BRAND's Needham residence.

42.     On or about July 30, 2015, ZHAO sent a check in the amount of $34,563.25 to GM Financial. The check memo stated: "Car loan for Peter Brand", and the face of the check noted "For Peter Brand # 457244937[.]"

ZHAO's Purchase of BRAND's Home Prior to ███ Zhao's Admission to Harvard

43.     Beginning in the summer of 2016, BRAND helped facilitate the admission of ZHAO's younger son, ███ to Harvard as a recruited fencer.

44.     At around the same time, BRAND paid off the mortgage on BRAND's Needham residence, before buying the home for well above its market value and financing (in part) the renovation of BRAND's new home in Cambridge. For example, on or about March 21, 2016, ZHAO paid $50,000 into an escrow account for BRAND and Phillip's purchase of the Cambridge condominium for $1.3 million, more than $300,000 above the asking price. On or about May 3,

10

2016, ZHAO closed on the purchase of BRAND's Needham home for $989,500, more than $440,000 above its assessed value.

45.     Because the Needham sale was far in excess of its assessed value, it triggered an on-site inspection from the city assessor. In his notes, the assessor wrote: "SOLD TO BUYER FROM VIRGINIA FOR $990 K??? PLACE IS VINTAGE 1960'S IN BAD SHAPE??? LIST AS "N" SALE. MAKES NO SENSE." Records indicate that an "N" sale refers to a non-arm's-length transaction.

46.     On or about June 16, 2016, BRAND emailed ███████ from his Harvard account, noting that his "goal is to have ████████ case presented requesting a likely letter on September 26, (the first likely letter meeting.)"

47.     On or about June 24, 2016, BRAND emailed Nathan Fry, the Associate Director of Harvard Athletics, that he had offered recruiting slots to ██████ and four other prospective students.

48.     On or about June 25, 2016, ██████ emailed BRAND, via BRAND's Harvard email account, his personal statement in support of his application.

49.     On or about September 13, 2016, BRAND emailed Fry and a Harvard admissions officer, noting that he wanted █████ and another candidate to be reviewed at the September 20, 2016 "likely letter" meeting. Attached to the email was an "Individual Rating Form" (IRF), which classified ██████ as a recruited athlete for men's fencing.

50.     On or about September 20, 2016, BRAND emailed a senior Harvard admissions officer to inquire, among other things, whether Harvard had made a decision about ████████ admission. The admissions officer responded, with respect to ██████ and another candidate: "we did review those two already and it looks good for both."

51.     On or about September 29, 2016, ███ received a "likely" letter from Harvard. On or about October 1, 2016, ███ informed BRAND in an email that he had received the likely letter, that he was "really looking forward to next year," and that he could not "thank you enough for all your help." BRAND forwarded the email to Phillips, stating, "Here it is."

52.     Between August 19, 2016 and April 11, 2017—during the period that ███ Harvard application was pending, and following his admission as a recruited fencer—ZHAO paid for at least $114,832.32 in renovations to BRAND's Cambridge condominium. ZHAO made the payments to S&H Construction, Inc. ("S&H"), a Cambridge general contractor. For example, ZHAO paid S&H $24,314.93 approximately one week after ███ received his likely letter on or about September 29, 2016. Memos on the cancelled checks indicate that they were in connection with BRAND's condominium.

53.     On or about July 30, 2017, ZHAO listed the Needham residence for sale for $699,000, approximately $290,000 less than he had paid for the house just one year earlier. ZHAO ultimately sold the residence for $665,000, incurring a loss of approximately $324,500.

Brand's Termination by Harvard

54.     Beginning in or about April 2019, the Boston Globe ("the Globe") published a series of articles concerning the admission of ZHAO's sons to Harvard as recruited fencers, and ZHAO's purchase of BRAND's Needham home. The Globe quoted ZHAO as saying, in substance, that he had purchased BRAND's Needham residence as an "investment," despite the fact that he never rented the house or otherwise obtained any income from the property, and sold it at a loss the following year. ZHAO also told the Globe that he wanted to improve BRAND's quality of life, because he had heard BRAND complain about his lengthy commute from Needham

to Cambridge.  ZHAO said he did not check the market value of the Needham home, and that the price was set by BRAND.

55.     In the wake of the Globe articles, and following an internal investigation, Harvard terminated BRAND for violating Harvard's conflict of interest policy.

## PROBABLE CAUSE TO BELIEVE THAT THE TARGET ACCOUNTS CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITIES

56.     I have probable cause to believe that the Target Accounts and associated data contain evidence, fruits, and instrumentalities of the Target Offenses.  Specifically, I believe that the Target Accounts will contain additional correspondence between BRAND, RYJIK, ZHAO, and/or other co-conspirators related to the Target Offenses and the formation of the Peter Brand Foundation.

57.     On or about August 14, 2020 and August 26, 2020, the government sent Google letters requesting under 18 U.S.C. § 2703(f) that the company preserve records associated with Target Account 2 and Target Account 1, respectively.[7]

### A.  Target Account 1 Contains Evidence, Fruits, and Instrumentalities

58.     As set forth above, email correspondence obtained from the NFF confirms that between at least September 2012 and August 2014, BRAND used Target Account 1 to communicate with RYJIK, Sbarbaro and Molloy concerning the formation of the Peter Brand Foundation.  As set forth in further detail above, Brand Foundation later received $100,000 from the NFF, which was in turn, funded by a $1 million payment by ZHAO.  The foundation was set up at approximately the same time that ZHAO made the payment to the NFF, and shortly before

---

[7] Based on my training and experience, in the event no data exists to preserve, Google will state as such to the individual/entity requesting preservation.  Google did not do so here.

BRAND recruited ZHAO's older son to Harvard. Accordingly, BRAND's communications concerning the foundation constitute evidence of the Target Offenses.

59.     Based on my training and experience, I know that many individuals retain email messages for years after they are received, simply taking no action with respect to emails and allowing them to sit in their "Inbox" indefinitely. Other individuals create folders for their various projects and/or endeavors. For example, the government was recently able to obtain copies of the emails referenced herein from the NFF, despite the fact that the emails were sent more than six years ago.

60.     Based on my training and experience, I know that even after the user of an email account obtains or begins using new email accounts, users typically do not delete their personal email accounts in their entirety. This is the case because individuals are often concerned about losing personal communications or important documents pertaining to business interests and dealings. Additionally, email users may set up their "old" email account to forward to their "new" email account, without modifying, deleting or otherwise altering all of the underlying data in the "old" email account.

61.     Based upon my training and experience, I also know that individuals frequently access and send emails from their cell phones. I also know that individuals may attempt to delete or archive emails on their cell phones, believing that the emails are also simultaneously deleted or archived from their Gmail account. However, emails may remain discoverable in email accounts regardless of the actions taken to delete or archive emails on an electronic device, such as a cell phone.

62.     There is therefore probable cause to believe that Target Account 1 will contain evidence, fruits and instrumentalities of the Target Offenses.

14

**B.  Target Account 2 Contains Evidence, Fruits, and Instrumentalities**

63.     As set forth above, email correspondence obtained from the NFF confirms that on or about October 24, 2013, BRAND created and/or began using Target Account 2 to email about the formation of the Peter Brand Foundation, approximately three days after ██ received a likely letter concerning his admission to Harvard.  Indeed, BRAND flagged for RYJIK that he was sending documentation via a "new" email account.[8]  For the reasons set forth above, I have probable cause to believe that the formation of the Peter Brand Foundation was part of a conspiracy to bribe BRAND to recruit ZHAO's two sons to the Harvard fencing team, thereby facilitating their admission to Harvard.

64.     There is also probable cause to believe Target Account 2 will contain additional communications concerning the Target Offenses.  For example, BRAND's October 25, 2013 email via Target Account 2 notes, "I just want to confirm that the contributions total 7.5 Million as we discussed this initially to make sure that all of this is worth my while."  BRAND's use of the word "confirm" provides probable cause to believe that there may be additional, earlier communications concerning contributions to the Brand Foundation.

## TECHNICAL BACKGROUND

65.     The email accounts described in this affidavit have various services and tools associated with them.  Google provides dozens of these services to Gmail users for personal and/or business convenience. These services can include: Calendar, Photos and Photo albums, Contacts, Drive, Docs, Wallet, Maps, YouTube, and many other applications.  These services are often times directly accessible through a customer's Gmail account.  For example:

---

[8] Nonetheless, BRAND continued using Target Account 1 after Target Account 2 was created.

a. Google Drive is a free file storage and synchronization service created by Google. It allows users to store 15 gigabytes (GB) of files in the "cloud," (i.e., off-site servers) share files, and edit documents, spreadsheets, and presentations. The service is integrated with Gmail. Users who wish to send a file in Gmail like a photograph or a word processing document, can insert the file into the email message using Google Drive. Google Drive is Gmail's default email attachment option.

b. Google Calendar is a time-management web application created by Google. Users are required to have a Google account in order to use this application. It is similar to desktop calendar applications such as Microsoft Outlook. Calendar is integrated with other Google services, such as Gmail. For example, if a message includes a reference to an event date or time, Gmail will automatically provide an option for the user to add the event to Google Calendar.

c. Google Contacts is a contact management tool that is available in Gmail. Among other things, it allows Gmail users to send emails to individuals whose contact information has been saved. These contacts can be located by name, categories, and other identifiable information. Many of the contacts automatically populate based on Gmail communications.

d. Google Photos is a photograph and video sharing and storage service offered by Google. It allows unlimited photo and video storage, with back up ability to cloud services. Larger photo files are saved to Google Drive, which, as previously mentioned, is linked to Gmail.

e.  Google Chrome Sync syncs a Gmail user's Google Account to its browser
search history.  This can be enabled across multiple devices.

66.    I know through my training and experience, as well as through discussions with
other agents, that individuals regularly use these integrated services in connection with their Gmail
accounts by, for example, saving email attachments to or sending attachments via Google Drive.
Likewise, Google Contacts is populated in part by individuals/entities that the user communicates
with via Gmail.  Because each of the products are integrated and use a single log-in (the
Google/Gmail log-in and password) and frequently auto-populate, Gmail users often use these
related services together with their Gmail.  Further, a preliminary review of numerous other
accounts obtained via a search warrant in this and related investigations revealed that certain users
of those target accounts also used related Google services including Google Drive and Google
messaging functionality in furtherance of Target Offenses.

67.    Email providers also typically maintain electronic records relating to their
customers.  These records include account application information, account access information,
and email transaction information.  Google stores and can provide some of this type of information.

68.    Some email providers, including Google, also store and can provide additional
information associated with and accessed through a subscriber's account including the following:
address books, buddy lists, photos, files, data, Calendar, Contacts, Docs, and Drive.  Of principal
importance to this investigation, and the subject of this warrant request, are the contents of the
email accounts.

17

## LEGAL AUTHORITY

69.     The government may obtain both electronic communications and subscriber information from an e-mail provider by obtaining a search warrant. 18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

70.     Any court with jurisdiction over the offense under investigation may issue a search warrant under 18 U.S.C. § 2703(a), regardless of the location of the website hosting company or e-mail provider whose information will be searched. 18 U.S.C. § 2703(b)(1)(A). Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant. 18 U.S.C. § 2703(g).

71.     If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber. 18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

72.     This application seeks a warrant to search all responsive records and information under the control of Google, a provider subject to the jurisdiction of this court, regardless of where Google has chosen to store such information. Pursuant to 18 U.S.C. § 2713, the government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

## REQUEST TO SEAL AND PRECLUDE NOTICE TO THE SUBSCRIBER(S)

73.     I request that this application, the warrant, the order, and any related papers be sealed by the Court until such time as the Court pursuant to Local Rule 7.2 directs otherwise.

74.     I further request that, pursuant to the preclusion-of-notice provisions of 18 U.S.C.

§ 2705(b), the Court order Google not to notify any person (including the subscriber to whom the

materials relate) of the existence of this application or the Court's Order for the earlier of one year

from the date of the Court's Order or upon notice by the government within 30 days of the

conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b).

Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal

investigation that is not public, and its disclosure may alert the targets to the progression of the

investigation.  There is accordingly reason to believe that notification of the existence of the Order

will seriously jeopardize the investigation, including by:  giving targets an opportunity to flee,

destroy or tamper with evidence, or change patterns of behavior.  *See* 18 U.S.C. § 2705(b).

Moreover, some of the evidence in this investigation is stored electronically.  If alerted to the

existence of the Order, the targets could destroy that evidence, including information saved to their

personal computers, on other electronic media, or in social media accounts.

### FOURTEEN-DAY RULE FOR EXECUTION OF WARRANT

75.     Federal Rule of Criminal Procedure 41(e)(2)(A),(B) directs the United States to

execute a search warrant for electronic evidence within 14 days of the warrant's issuance.  If the

Court issues this warrant, the United States will execute it not by entering the premises of Google,

as with a conventional warrant, but rather by serving a copy of the warrant on the company and

awaiting its production of the requested data.  This practice is approved in 18 U.S.C. § 2703(g),9

---

[9] Section 2703(g) provides that "[n]otwithstanding section 3105 of this title, the presence of an officer shall not be required for service or execution of a search warrant issued in accordance with this chapter requiring disclosure by a provider of electronic communications service or remote computing service of the contents of communications or records or other information pertaining to a subscriber to or customer of such service."

and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.

76.     Based on my training and experience and that of other law enforcement, I understand that e-mail providers sometimes produce data in response to a search warrant outside the 14-day period set forth in Rule 41 for execution of a warrant.  I also understand that e-mail providers sometimes produce data that was created or received after this 14-day deadline ("late-created data").

77.     The United States does not ask for this extra data or participate in its production.

78.     Should Google produce late-created data in response to this warrant, I request permission to view all late-created data that was created by Google, including subscriber, IP address, logging, and other transactional data, without further order of the Court.  This information could also be obtained by grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit.  However, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as e-mail, absent a follow-up warrant.

79.     For these reasons, I request that the Court approve the procedures in Attachment B-1 and B-2, which set forth these limitations.

## CONCLUSION

80.     Based on the information described above, I have probable cause to believe that records and data from the Target Accounts (as described in Attachments A-1 and A-2), contain evidence, fruits, and instrumentalities of the above-listed crimes (as described in Attachment B-1 and B-2).

81.    The procedures for copying and reviewing the relevant records are set out in Attachment B to the search warrant.

Respectfully submitted,

Laura Smith, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me telephonically

on __September 29, 2020_

United States Magistrate Judge

21